# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF PUERTO RICO

WILFREDO JIMENEZ RODRIGUEZ,
Petitioner,

v.

UNITED STATES OF AMERICA,
Respondent.

Civil No. 97-1285 (HL)
Crim. No. 94-016 (HL)

## OPINION AND ORDER

Before the Court is a petition for postconviction relief under 28 U.S.C. § 2255 filed by Wilfredo Jimenez Rodriguez ("Jimenez"). The superseding indictment in his criminal case charged him with three counts: conspiring to possess heroin with intent to distribute; possession with intent to distribute heroin; and conspiring to make false statements in order to obtain a passport, in violation of 18 U.S.C. §§ 2 & 1542 and 21 U.S.C. §§ 841(a)(1) & 846. Jimenez went to trial in April of 1994 and was found guilty only as to the charges of conspiracy to possess heroin with intent to distribute and conspiracy to make false statements in order to obtain a passport. Jimenez was sentenced on August 5, 1994 to 33 months of imprisonment, a special monetary assessment of $100, and 36 months of supervised release. He appealed, and on December 1, 1995, the First Circuit affirmed his conviction in an unpublished opinion. *See United States v. Jimenez Rodriguez*, 70 F.3d 1253 (1st Cir. 1995). Jimenez then filed the present petition.

## DISCUSSION



AO 72A
(Rev 8/82)

Civil No. 97-1285 (HL)                      2
Crim. No. 94-016 (HL)

Jimenez claims that the Government failed to disclose prior to trial exculpatory *Brady* material, namely, evidence regarding Carmen Toledo Gonzalez' ("Toledo") false passport and driver's license and her prior work as a government informant. *See Brady v. Maryland*, 373 U.S. 83 (1963). The Constitution is not violated every time that the Government fails to disclose exculpatory evidence. *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995). Exculpatory evidence is material, and a constitutional error results from its suppression, "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 433-34 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985)); *Gilday v. Callahan*, 59 F.3d 257, 267 (1st Cir.1995), *cert. denied* 516 U.S. 1175 (1996). A reasonable probability of a different result is shown when the Government's suppression of evidence "'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). The question is whether, in the absence of the suppressed evidence, the defendant received a trial that is "worthy of confidence." *Id.* at 434.

### 1. Toledo's False Passport and Driver's License

With regard to the allegedly-withheld evidence on Toledo's false passport and driver's license, Jimenez asserts that a handwriting expert that he retained after trial opined that Toledo, and not Jimenez, filled out the fraudulent application for the driver's license. This is directly contrary to the evidence presented by the Government at trial that Jimenez

Civil No. 97-1285 (HL)                                              3
Crim. No. 94-016 (HL)

had obtained the license for Toledo. According to Jimenez, this newly-discovered evidence "casts grave doubts . . . upon the implications leading to Mr. Jimenez' culpability as to the passport conspiracy [under 18 U.S.C. §§ 2 & 1542]" because questions about the identity of the person who applied for the driver's license infect "by implication . . . the rest of the identification [procured under Toledo's assumed name]." Dkt. No. 1.[1]

Whether a showing that Toledo filled out the application for a driver's license would tend to show that Toledo, instead of Jimenez, also filled out her passport application is highly doubtful. This inference is made even more doubtful by the conspicuous absence in Jimenez' motion of any indication that his retained handwriting expert also examined the passport application. Such an attenuated inference can not give rise to a *Brady* violation because the evidence suggesting that Toledo applied for her driver's license, even if the Government withheld that evidence, is not material. In other words, there is not a reasonable probability that the jury would have found Jimenez not guilty on the passport conspiracy count if it had seen the evidence regarding the driver's license application.

Jimenez goes on to argue that the Government purposely withheld evidence that Toledo used her assumed name in a number of contexts for her personal gain. The alleged evidence which Jimenez claims was withheld dealt only with Toledo's use of false

---

[1]Citations to the record are omitted for the remainder of this Opinion and Order, as all subsequent quotations are extracted from Jimenez' § 2255 petition, Dkt. No. 1.

Civil No. 97-1285 (HL)  
Crim. No. 94-016 (HL)

4

identifications. Even if the Government had such evidence and withheld it, there would not be a *Brady* violation. At trial, the defense presented evidence of Toledo's use of false identifications and fraudulent transactions. The record contained fertile ground for an attack on her credibility, and such an attack was made. Unfortunately for Jimenez, the jury did not find it convincing. Even if the Government did have additional evidence on these points – and there is no indication that it did – any failure by the Government to disclose it would not have undermined confidence in the outcome of the trial. Thus, Jimenez' claim of a *Brady* violation is unavailing.[2]

### 2. Toledo's Alleged Prior Work as a Government Informant

In addition to his claims regarding Toledo's false passport and driver's license, Jimenez also raises a claim based on Toledo's alleged prior work as a government informant. According to Jimenez' petition, the Government withheld evidence that Toledo had been working as a government informant since 1991. At trial, the Government presented evidence that Toledo became an informant in 1993. Evidence that Toledo

---

[2] Jimenez also raised this argument on direct appeal. The First Circuit denied this argument. *See Jimenez-Rodriguez*, 70 F.3d 1253, 1995 WL 709639, at *5. A petitioner may not raise in a section 2255 claim an issue that was resolved on direct appeal. *Murchu v. United States*, 926 F.2d 50, 55 (1st Cir. 1991), *cert. denied*, 502 U.S. 828 (1991). Jimenez also makes a passing reference to perjury committed by Toledo. Although this argument is not properly developed in Jimenez' § 2255 petition, he raised this argument on direct appeal, and the First Circuit denied it. *See Jimenez-Rodriguez*, 70 F.3d 1253, 1995 WL 709639, at *4. Thus, he may not raise this issue here. *See Murchu*, 926 F.2d at 55.

Civil No. 97-1285 (HL)                                          5
Crim. No. 94-016 (HL)

became a government informant in 1991, insists Jimenez, could have been used to impeach Toledo's credibility.

In support of this claim, Jimenez attempts to create an inference that Toledo had been a government informant long before 1993. This inference is built on an effort to show that two confidential informants referred to in various law enforcement agents' affidavits as "CI3" and the "third unrelated CI" are actually Toledo.

The first purportedly suspicious coincidence that Jimenez highlights is the fact that two affidavits are "strikingly similar." One of the two affidavits was sworn out by DEA Special Agent James Baker on February 24, 1994. The other affidavit was sworn out by Baker, Customs Agent Jorge Calderon, and Puerto Rico Police Department Task Force member Pablo Rivera on March 24, 1994. The two affidavits both describe statements made to authorities by the third unrelated CI about the drug-trafficking activities of Francisco Reyes-Vejerano ("Reyes"), Jimenez' codefendant. Far from being a suspicious coincidence, the similarity between these two affidavits is readily explainable by the fact that they both openly describe the same people and events and are both sworn to by DEA Special Agent James Baker, among others. There is simply nothing suspicious about any similarities between these two documents and certainly nothing that could support a claim of a *Brady* violation.

AO 72A
(Rev.8/82)

Second, Jimenez attempts to prove more directly that Toledo had been a government informant since 1991. According to Jimenez, Toledo is referred to as CI3 in certain affidavits and is referred to as the third unrelated CI in another. CI3, like Toledo, made a statement to the Government in October, 1993. The third unrelated CI, on the other hand, made a statement to the Government in March, 1991. If Toledo is in fact the third unrelated CI, as Jimenez suggests, then Toledo began cooperating with the Government as early as March, 1991.

Marshaling the facts to establish Toledo as CI3 and the third unrelated CI proves more difficult for Jimenez than does making the allegations. Jimenez successfully creates an inference that Toledo is CI3, but he fails to do so with regard to Toledo's identity as the third unrelated CI. In the March 24, 1994 affidavit sworn out by Agents Baker, Calderon, and Rivera, CI3 is referred to as having lived in Reyes' house and having moved to the house in response to a newspaper ad seeking a farm caretaker. These facts, combined with the fact that CI3's statement was made in October, 1993, point to the strong possibility that CI3 and Toledo are the same person. Toledo also lived in Reyes' house after moving in response to a newspaper ad seeking a farm caretaker. Further, Toledo began cooperating with the Government in October, 1993.

From showing that Toledo may be CI3, Jimenez attempts a leap that is simply not supported by the facts. He asserts that Toledo is also the third unrelated CI. According to

Civil No. 97-1285 (HL)                                                7
Crim. No. 94-016 (HL)

Jimenez, the affidavit sections relating to CI3 (whom he posits to be Toledo) "follow[] an amazingly close script" to the affidavit sections relating to the third unrelated CI. Upon review of these sections, however, it becomes clear that the only similarity between the facts regarding CI3 and the facts regarding the third unrelated CI is that both informants saw large amounts of cocaine on top of Reyes' desk at his farm. Jimenez claims that "it is simply unreasonable to believe" that more than one person could have seen large amounts of cocaine on Reyes' desk. So, Jimenez reasons, CI3 and the third unrelated CI must be the same person, namely, Carmen Toledo.

Jimenez further attempts to support his conclusion by pointing out that both CI3 and the third unrelated CI "describe the violent character and lifestyle of Reyes" via "coinciding information." Once again, the similarity between the two informants' observations is less than impressive. According to the February 24, 1994 affidavit of Agent Baker, the third unrelated CI "described [Reyes] as a man of a violent nature who always carries weapons on his person." CI3's "coinciding information" is that Reyes "received and subsequently fired some weapons at the farm including Ingram machine guns, pistols, and sawed-off shot guns. Subsequently, . . . and according to what [Reyes] told CI3 the weapons were to be smuggled to the Dominican Republic." Again, it is simply too much of a stretch to suggest that these statements give rise to an inference that CI3 and the third unrelated CI are the same person.

Civil No. 97-1285 (HL)　　　　　　　　　　8
Crim. No. 94-016 (HL)

Finally, Jimenez asserts that the Government's conduct at trial proves that CI3 and the third unrelated CI are both Carmen Toledo. During its examinations of Toledo, the Government never asked her about having seen large amounts of cocaine on Reyes' desk or about her observation that Reyes' had a "violent character." According to Jimenez, this

> "[leads] inexorably to the inference that the government refused to disclose the connection between Carmen Toledo, the young, scared, pregnant woman who determined to become a government witness on October 7, 1993, and that same person who had already – indeed, in March 1991 – determined to disclose information about [Reyes] to the authorities."

Jimenez' conclusion rests on the inference that Toledo is CI3 and on the notion that Toledo was the informant who commented on Reyes' "violent character" in Agent Baker's February 24, 1994 affidavit. Unfortunately for Jimenez, the third unrelated CI is the informant who commented on Reyes' "violent character," and there is no evidence to suggest that the third unrelated CI is Toledo. Further, even granting Jimenez the more tenable inference that Toledo is CI3, the Government's failure to ask Toledo on the stand about CI3's observations of cocaine on Reyes' desk is simply insufficient to allow one to make the leap to the conclusion that Toledo is the third unrelated CI.

In sum, Jimenez' § 2255 petition rests on a string of unsupported inferences that can not form the basis of a successful collateral attack on his conviction.

WHEREFORE, for all of the reasons set forth above, the Court denies Jimenez' § 2255 petition. Judgment shall be entered accordingly.

AO 72A
(Rev.8/82)

Civil No. 97-1285 (HL)  9
Crim. No. 94-016 (HL)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, February 21, 2001.

HECTOR M. LAFFITTE
Chief U.S. District Judge